## THE GREENWICH.

## THE WILLIAM M. TUPPER.

(District Court, S. D. New York. January 24, 1921.)

Collision ⬥⇒40—Both vessels held at fault in collision in Long Island Sound.

Where steamer collided with steam tug in Long Island Sound at night *held*, that the steamer was at fault in not hearing the tug's whistle and in not seeing her lights, and the tug was at fault in not keeping proper lookout, so that damages would be decreed half against each vessel.

In Admiralty. Libel by the Gulf & Southern Steamship Company, owner of the steamer William M. Tupper, against the steam tug Greenwich, with cross-libel by the Red Star Towing & Transportation Company, owner of the steam tug Greenwich, against the steamer William M. Tupper. Decree against each vessel for half damages.

Decree affirmed 291 Fed. 80.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for Gulf & S. S. S. Co. and the Tupper.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for Red Star Towing & Transportation Co. and the Greenwich.

KNOX, District Judge. The William M. Tupper is a freight ship, 229 feet in length. She was built in 1917, and her navigation running

lights are equipped with electricity; each light containing two 32-candle power bulbs. The vessel, in ballast, left Boston on the evening of June 6, 1918, bound for New York by way of Long Island Sound. All went well until about 3 o'clock of the morning of June 7. At that time the weather was clear, with a small moon showing, and it had so continued for the previous two hours.

The Tupper's master and Second Officer Curry were on the bridge, a sailor was at the wheel, and another in the lookout. At the hour specified Eaton's Neck Light was abeam and about 2½ miles off. The vessel was proceeding at her full speed of 9½ knots and was on a west ¼ north magnetic course. When the ship had reached a point about 4 miles to the westward of Eaton's Neck Light, the master testifies he saw a white light, and shortly thereafter the green light, of a vessel afterwards learned to be on board the steam tug Greenwich. The master estimates that the lights, when first observed, were not over a quarter of a mile distant, and showed about 1½ points off his port bow. He further says that, from seeing only one white light, he did not know that the Greenwich had a scow in tow.

The Greenwich had left Hempstead Harbor at 11 o'clock on the previous night, having in tow one loaded dumping scow on a 600-foot bridle hawser. She was bound for the dumping grounds in the vicinity of Cedar Buoy, off Eaton's Neck. From Matinicock Buoy, which had been left behind, the Greenwich was proceeding due east, and was on such course, being the usual one, when the accident occurred. The tug, according to her witnesses, carried the regulation headlight, two side lights, and three staff lights. All are said to have been set and brightly burning. A man named Bartran was at the wheel of the Greenwich, and at the time of the accident he did not hold a license to navigate the waters he was then traversing. To keep Bartran company, a deckhand named Skidmore, who was also acting as lookout, was in the pilot house. It being the master's off watch, he was asleep in the pilot house, but within reach of Bartran's arm.

The first the Greenwich saw of the Tupper was when Bartran sighted her red and after range lights 1½ points off the tug's starboard bow. The lights were thought to be something more than one-half mile off. When the distance had lessened to half a mile, Bartran claims to have blown one blast of the tug's whistle to indicate that the tug would pass under the Tupper's stern. It is said, upon behalf of the tug, that no answer was received to her signal, and thereupon Bartran ported his wheel, so as to veer a point more to starboard, and thereby expecting his red light to show as clearing the Tupper. The latter is then claimed to have closed in her red light, and Bartran, anticipating a collision, blew a danger signal and stopped his engines. At this, the Tupper, which was all but upon the Greenwich, blew according to the Greenwich two, the Tupper says three, blasts of her whistle. Then it was that the tug's master was awakened, and he, taking the wheel, put it over hard astarboard. This maneuver, which in all probability averted a more serious accident, was shortly followed by the collision of the Tupper's starboard bow with the starboard quarter of the Greenwich. The boats cleared, and the Tupper, passing

over the hawser from the Greenwich to her tow, struck with her port bow that of the scow.

So far as the Tupper's lights are concerned, she had two on her staff, the regulation running lights, and a number of lighted electric bulbs along her deck. Her master says that, upon seeing the lights of the Greenwich, he believed the vessel to be crossing his bow from port to starboard. The steamer was, under the starboard hand rule, the privileged vessel, and was required to keep her course and speed. This she did not do. Instead her master stopped the engines and hard astarboarded her wheel. As soon as the ship's bow began to swing to port, the engines were put full speed astern and the ship blew three short blasts upon her whistle. The master says that, had he not taken such action, he would have run down the tug, and the maneuver was the only means of avoiding or minimizing the collision.

After the collision the Greenwich passed astern of the Tupper on the latter's starboard bow, whilst the two drifted down the port side. The Tupper proceeded back to the tug to inquire if assistance was needed, and it was not, and upon her approach first picked up the tug's white light, and when quite close, so says the master, managed to see her green light, which was very dim. The master also says that as he approached he endeavored to make out the tug's lights with his glass, but was unable to do so.

The steamer's second officer testified that he at no time saw the tug's red light, and that she showed no towing lights. He says, too, that the only signals he heard from the tug was when she blew two blasts a few seconds before the vessels struck. As between the deposition of the second officer and his testimony before the steamboat inspectors, immediately after the accident, there is considerable discrepancy. In view, however, of the apparent agreement of counsel that the stenographer, who reported the testimony before the inspector, was incompetent, I should not, I think, charge the discrepancies too strongly against the officer.

Coming, then, to my conclusions, I can say that I have little doubt that the Tupper blew three blasts of her whistle, instead of two, upon the occasion of her only signal to the Greenwich. By testimony of the same character as that upon which such conclusion is reached. I also find that the Greenwich, some minutes before the collision, blew a signal of one blast to the Tupper. There is, in addition, the fact that those in charge of the Tupper did not, until almost the last moment, observe the lights of the Greenwich. In not hearing the tug's whistle and in not seeing her lights there was fault upon the part of the Tupper.

The lights of the tug were produced in court; they appear to be quite sufficient for the purposes they were intended to serve, if, upon the morning in question, they were set and burning. Furthermore the lights had passed inspection only a short while before. The testimony from the Greenwich is all to the effect that her lights were set and burning. I believe such to have been the fact, and, so finding, conclude that they were visible for a much greater distance than a quarter of a mile. It follows that no proper lookout was kept from the

Tupper. In this connection it may be said, in passing, that her sailor lookout and wheelsman were not produced or accounted for.

I also find that the Greenwich kept no proper lookout. As I have said, the Tupper was lighted by electricity, and no question is made of their lacking in brightness. They simply were not seen when they first became visible, and this was probably due to the fact that Bartran and the deckhand, who was supposed to be acting as lookout, were too busily engaged in keeping each other company.

When the light of the steamer was picked up, I question if the pilot of the Greenwich appreciated the speed with which the Tupper was approaching. Had he done so, I think it likely he, realizing himself to be under the burden of keeping out of the way, would have more quickly ported his wheel, rather than to further continue upon his course until within what is estimated to be a half mile of the steamer. Even then, however, the accident might have been avoided, had the Tupper taken note of the whistle from the Greenwich. It was not, however, until some time after this that the steamer noticed the presence of the Greenwich. The emergent situation, then speedily developing, was in my judgment largely contributed to by the Tupper.

I think that the case comes within the principle suggested by the Circuit Court of Appeals for this circuit in Delaware, L. & W. R. Co. v. Central R. Co. of N. J., 238 Fed. 560, 151 C. C. A. 496, to wit:

"At all events, a navigator may not blindfold his eyes, and then say, after collision, that although he did not see her [the colliding vessel] at all, the fault under the rules was with the other vessel. The fundamental rule of the admiralty is that a vigilant lookout must be kept on all vessels, so that a collision may be prevented, even with those which are violating the rules."

A decree will be entered against each of the vessels here concerned for half damages.